The judgment of the court Was pronounced by
Preston, J.
This is a petitory action. The plaintiff claims a tract of land situated in the parish of Morehouse, containing two hundred arpents, more or less, and which he describes in his petition. He alleges that he, and those under whom he claims, possessed the land, as owners, for more than thirty years.
The defendant settled on the land in 1846, as belonging to the United States, with the intention of acquiring it by preemption. In 1847, the plaintiff brought a possessoiy action against him, and sequestred the land. Judgment in this suit was rendered in favor of the defendant in 1848. The defendant then commenced a suit for damages on the sequestration bond. That suit was consolidated with this, both were tried together by a juiy, who rendered a verdict for the plaintiff.
The documentary evidence offered by the plaintiff shows, that on the 9th of October, 1805, Abraham Morehouse sold to Samuel Buckner, four hundred acres of land in the concession of twelve leagues square made by the King of Spain to the Baron de Bastrop. On the 19th of March, 1806, Buckner sold one hundred acres of the land to George Hook, and on the 13th of September, 1809, sold the other three hundred acres back to Abraham Morehouse. On the 26th day of December, 1812, Morehouse sold the three hundred arpents of the land to Richard Williams, and on the 27th of October, 1812, Williams sold one hundred arpents to Needham Reynolds, retaining two hundred arpents of the tract for himself.
On the 22d of August, 1815, the sheriff of the parish of Ouchita, by virtue of an execution in the suit of John Blair against Richard Williams, sold a tract of land containing two hundred arpents, near the Mer Rouge, to D. B. Stowe, for $240, which was paid ; and on the 5th of November, 1846, Stowe sold the land to the plaintiff.
The survey made by the parish surveyor in 1849, by order of court in this suit, and the oral testimony, shows sufficiently that the land in controversy was the subject of these ancient conveyances.
The deeds we have recited show a civil possession by the plaintiff and those under whom he claims for thirty years before the defendant entered upon the land, and by titles translative of property. The titles and prescriptions of ten, twenty and thirty years, would therefore avail the plaintiff, if there be nothing peculiar to this case to take it out of the x’ules of prescription and property.
The defendant alleges, that the land in controversy belongs to the United States; that he has made a settlement upon it, with a view to acquire title by preemption, and that the plaintiff can have neither title nor prescription, by which to evict him of his possession even without title.
It is matter of public notoriety and has never been disputed by the Government of the United States, but, on the contrary, the government has made it notorious, by the publication of the documents in the volumes of their land laws, and papers relative to the public lands, that the Baron Carondelet, a Spanish *638 Governor General of Louisiana, towards the close of the last contury, entered into a negotiation with the Baron de Bastrop, which resulted in a grant of twelve leagues square of land, located, by a survey, on the bayou Bartholemy, for the purpose of making an extensive settlement for the cultivation of wheat, and the manufacture and exportation of flour to Havana and elsewhere. The enjoyment of the banks of the bayou was granted to him to establish mills, and the lands to locate families. It was proposed to introduce five hundred families, and a gratuitous grant of four hundred arpents of land was to be made to each family. It is matter of history, that the plan was partially executed by the introduction and location of some families on the grant. It was suspended on account of the want of funds in the treasury of the province; — the governor having undertaken to bear a portion of the expenses, and probably on account of the embarrassments of the Baron de Bastrop — and was abandoned in consequence of the subsequent change of the government.
By the treaty of cession of Louisiana to the United States, the vacant lands not private property was ceded to the government; but the inhabitants were guaranteed in the enjoyment of their private property. That property necessarily embraced every thing or claim that was valuable to an individual; for a claim, however weak, is property, if value can be fairly obtained for it.
As early as March, 1805, Congress, with a view to separate the public domain, that is, the vacant land that was not private property, from the private claims to land in Louisiana, and to carry into effect the guarantee of the treaty, passed “ an act for ascertaining and adjusting the titles and claims to land within the Teritory of Orleans and District of Louisiana.” It opened land offices and, by the 4th section of the act, invited every person claiming land by virtue of a complete Spanish grant, to deliver to the recorder of land titles a notice in writing, stating the nature and extent of his claims, together with a plat of the tract claimed, and to deliver the grant for the purpose of being recorded.
The board of commissioners were directed to make a report of their decisions on claims, to be laid before Congress for their determination thereon. In 1806, the act was amended, and, among other things, it was provided that the lands embraced by the report should not be otherwise disposed of until a decision of Congress shall have been had thereupon. The act of 1805 was amended and extended in 1807.
Abraham Morehouse had acquired from the Baron de Bastrop a large interest in the grant, and about this time presented his claim to the board of commissioners established by the government, for record and confirmation. His claim was not confirmed, but rejected by the board of commissioners. The claim was, therefore, entitled to the benefit of the provision that the lands could not be disposed of until a decision of Congress upon it, which was reiterated in several subsequent acts of Congress. And, indeed, although claims founded upon incomplete titles might be subject to the decision and generosity of Congress, yet claims founded upon complete, grants could be subject only to the decision of the judiciary if contested by Congress or the executive officers of the government. And it is known that the United States are at this moment contesting before the judiciary department of the government, with claimants under Morehouse, the effect of the grant to Bastrop.
From these general views, which might be made much more forcible by entering into details and invoking authorities, it is manifest that Morehouse had a claim which the government has already and no doubt will continue to contest before the judiciary; but until the government does succesfully contest and have *639 the claims under the grant declared invalid, it is bound By the treaty of cession, also by the act of 1806 and many subsequent acts of Congress not to regard and treat the claims as nullities. Therefore, no person under the authority of the United States can settle on the land with a view to acquire it by preemption, because the government induced Morehouse to file hiB claim and record his title, as well to separate the public domain from private claims, as in obedience to the treaty of cession ; and as an inducement, bound itself not to make any disposition of the land until a decision by Congress on the claim, and indeed cannot make any disposition of it, on principle, until a decision by the courts of the United States against the claim.
From what has been said, it is clear to us that the vendees under Bastrop, in good faith, claimed the land in his grant by title. The claim is valuable to them, because the sales in this record show that the claimants have been able to sell the lands for money. That value is property guaranteed to the claimants by the trealy of cession. Congress has, by various acts, declared they will not make any disposition of the property until a decision against the claimants of the land. Therefore no person can, in any shape, interpose the United States to shield their possession against a claimant under Bastrop's grant.
It is, however, contended by the defendant, that the sheriff’s deed to Stowe is not supported by an execution, and is so defective as not even to convey the title Williams derived from Morehouse. Williams, the defendant in execution, might perhaps have required further proof than this deed affords of the forced alienation of his properly; but as he has been silent for more than thirty years, it is not for others who do not set up, but repudiate his title, to complain of the want of formality in selling his property. It is to be recollected, that the deed was made on the 22d of August, 1815, and therefore was governed by the act of 1805 then in force, regulating executions, and not by the Code of Practice. The 10th section of that act made the deed admissible in evidence. 2 Mart. Dig. 334. And an act approved in 1828, gave copies of the deed the same force as the copy of an authentic act'; so that this title, without the execution or sheriff’s return, has the force of an authentic act as to third persons.
This, with the preceding chain of title from 1805 and the civil possession at least after the sheriff’s deed, is a sufficient title upon which to maintain a petitory action against one who neither alleges nor attempts to prove any title in himself, except tortuous possession. For we concur fully in the decision of the Supreme Court in the case of Baillo v. Burney et al. 3 R. R. 319. See also the cases of Paten v. Blaise, 19 L. R. 396; and Bedford v. Urquhart.
We are not satisfied the defendant suffered, or should recover any damages in consequence of the sequestration of the land in the possessory action, or that he is entitled to any thing for improvements.
The judgment of the district court in favor of the plaintiff for the land described in his petition, and in the survey made by the parish surveyor by order of court in this suit is affirmed, with cost. And in the suit of J. C. Whetstone v. John Boyd et al. for damages on the sequestration bond, it is decreed that there be judgment for the defendants, with costs.
By SniDEim, J. I decline sitting in the decision of this cause; but the parties having requested me to sit, pro forma, to form a quorum. I have done so, and left the case with my bretheren, who concur in opinion. I wish, therefore, to be considered as expressing no opinion in the case.